J-A29004-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

IN THE INTEREST OF: Q.L.W., A MINOR,  :  IN THE SUPERIOR COURT OF
    :         PENNSYLVANIA
    :
    :
    :
APPEAL OF: Q.L.W., A MINOR    :  No. 75 WDA 2014

Appeal from the Order August 22, 2013,
Court of Common Pleas, Allegheny County,
Criminal Division at No. 1097-10

BEFORE:  DONOHUE, ALLEN and STRASSBURGER*, JJ.

MEMORANDUM BY DONOHUE, J.:        **FILED NOVEMBER 17, 2014**

Appellant, Q.L.W., appeals from the order entered on August 22, 2013 in the Court of Common Pleas of Allegheny County adjudicating her delinquent of aggravated assault,[1] criminal conspiracy to commit aggravated assault,[2] and aggravated assault of an unborn child.[3]  We affirm.

The trial court summarized the relevant testimony in this case as follows:

> M.D. (age seventeen) had been involved in a relationship with L.E. and was three months pregnant with L.E.'s child. … M.D. met L.E. in [an] alley near her home on December 15, 2012.  They talked for about ten minutes and L.E. gave her a hug.  The couple ended their meeting and M.D. returned home.  Shortly after having arrived home, M.D. stated that she received another call from L.E. who told her that he wanted to meet her for a

---

[1]  18 Pa.C.S.A. § 2702(a)(1).

[2]  18 Pa.C.S.A. § 903(a)(1).

[3]  18 Pa.C.S.A. § 2606(a).

*Retired Senior Judge assigned to the Superior Court.

second time in order to give her a kiss. M.D. agreed to meet L.E. at the same place. M.D. testified that when she met up with L.E., he kissed her on the head. She stated that he appeared a little bit nervous and told her that this would be the last time she would see him. M.D. stated that she gave him a funny look and that L.E. laughed and said, 'I'm just playing with you.' M.D. gave L.E. a kiss and then began to walk towards her home. M.D. testified that as she walked away she turned around twice to look at L.E. The second time she turned to look at L.E., he was gone, but she saw [Q.L.W.] walking in the alley.

M.D. stated that [Q.L.W.] began walking towards her and then began to skip and run towards her. When [Q.L.W.] finally caught up with M.D., [Q.L.W.] struck M.D. on the right side of her face with a closed fist. M.D. stumbled and [Q.L.W.] hit her again on the right side of her face with a closed fist, causing M.D. to fall on a gate. [Q.L.W.] pulled M.D. by the hair causing her to fall to the ground. While M.D. was on the ground, [Q.L.W.] struck and kicked her about ten times. While she was on the ground, a second attacker, Richard Eubanks [("Eubanks")], an adult, joined in on the assault and also repeatedly kicked and struck her. … After the assault ended[,] and [Q.L.W.] and [Eubanks] appeared to be leaving, M.D. grabbed the leg of [Q.L.W.] and observed that [Q.L.W.] was wearing a pair of white, blue, gray, and pink shoes that she recognized as a style of sneakers known as "Diamond Turfs."

\* \* \*

On January 16, 2013, the police showed M.D. a photo array and M.D. identified [Q.L.W.] as the female who attacked her on December 15, 2013.

Although she had been repeatedly struck about the face and body, M.D. testified that other than a broken nail, she did not suffer any facial injuries, cuts, broken bones, or anything of that nature. Her glasses were broken.

During cross-examination, M.D. stated that she had initially believed the female attacker to be the girlfriend of L.E.'s brother and that she had reported this belief to the police on the night of the assault. However, the next day, when she learned that [Q.L.W.] owned a pair of the white, blue, gray and pink Diamond Turf shoes that matched the shoes worn by her attacker[,] she believed that [Q.L.W.] was her female attacker.

*    *    *

The Commonwealth called Celena Humphreys [("Humphreys")] as the second witness. [Humphreys] is the mother of L.E.

*    *    *

[Humphreys] testified that [on December 7, 2012,] she overheard a telephone conversation in which [Q.L.W.] was involved. [Humphreys] reported that she heard [Q.L.W.] state "I tried to hurt [M.D.] … My cousin will do it." [Humphreys] heard the ringing of an outgoing telephone call because the [speakerphone] was activated. When the call was answered, [Humphreys] heard a female voice on the line. She did not recognize this voice. The female voice asked the question[,] "What is it that you want me to do?" [Humphreys] testified that [Q.L.W.] answered, "When you see her, don't say anything, hit her till she falls and then start kicking her."

[Humphreys] stated she heard her son ask [Q.L.W.] "Is she going to do it?" and [Q.L.W.] replied[,] "Of course she's going to do it. She's about that life."

*    *    *

[Humphreys] stated that she immediately reported the plot to "jump" M.D. to L.E.'s father as well as to her husband who was downstairs in the home. Later that evening, [Humphreys] also confronted L.E. on what she had heard, and reprimanded him by saying

"I know you don't want this baby, but that's not the way to go about it." When she was interviewed by the detectives on December 19, 2012, she informed the detectives about the conversation she overheard between [Q.L.W.], L.E., and the female voice on the phone.

Trial Court Opinion, 3/28/14, at 4-8 (footnotes and record citations omitted).

On March 15, 2013, Q.L.W. was charged in a delinquency petition under the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, with aggravated assault and conspiracy to commit aggravated assault. On June 3, 2013, the trial court granted the Commonwealth's motion to amend the juvenile petition to add aggravated assault of an unborn child. On August 7, 2013, following several continuances, the trial court held a hearing on the case wherein it took testimony and heard arguments by counsel. That same day, the trial court found beyond a reasonable doubt that Q.L.W. had committed each of the delinquent acts with which she was charged. On August 22, 2013, the trial court entered an order committing Q.L.W. to the Bethesda Group Home.

On September 20, 2013, Q.L.W.'s counsel filed a motion for reconsideration. On October 16, 2013, the trial court denied the motion for reconsideration because Q.L.W.'s counsel did not file it within ten days of the August 7, 2013 order, as required by Rule 620 of the Pennsylvania Rules of Juvenile Court Procedure, and it was therefore untimely. On October 24, 2013, Q.L.W.'s counsel filed a motion for leave to file post adjudicatory motions, *nunc pro tunc*. On October 28, 2013, the trial court granted this motion and vacated the order entered on October 16, 2013, dismissing

Q.L.W.'s motion for reconsideration. On December 2, 2013, after argument, the trial court once again denied the motion for reconsideration. On December 31, 2013, Q.L.W. filed a timely notice of appeal. On January 6, 2014, the trial court ordered Q.L.W. to file a concise statement of the errors complained of on appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure.[4] On February 7, 2014, Q.L.W. filed a timely Rule 1925(b) statement.

On appeal, Q.L.W. raises the following three issues for review:

I.      Was the evidence presented at trial [insufficient] to establish, beyond a reasonable doubt, that Q.L.W. was one of the people who assaulted [M.D.] where [M.D.] solely identified Q.L.W. based on someone else's account that Q.L.W. and the female attacker wore similar sneakers?

II.     Was the evidence [insufficient] to support Q.L.W.'s adjudication at all three counts on a conspiracy theory of liability where the Commonwealth failed to show Q.L.W. directly [participated] in the alleged attack and one witness's testimony regarding pieces of a conversation she overheard approximately one week before the attack is insufficient in and of itself, to prove Q.L.W. conspired to commit the crimes at issue?

III.    Did the trial court abuse its discretion in denying Q.L.W.'s post[-]sentence motion that the verdict was against the weight of the evidence where [M.D.]'s identification of Q.L.W. and her account of the alleged assault were entirely untrustworthy?

---

[4]    Q.L.W. received an extension of time for filing her Rule 1925(b) statement.

Q.L.W.'s Brief at 5-6.

Q.L.W.'s first and second issues on appeal claim that the evidence was insufficient to prove that Q.L.W. committed the three above-referenced crimes. Q.L.W.'s Brief at 18-32. In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa. Super. 2013) (internal quotations and citations omitted).

Q.L.W. first asserts that the evidence was insufficient to prove her identity as one of M.D.'s attackers. Q.L.W.'s Brief at 18-24. Q.L.W. bases this assertion on M.D.'s testimony indicating that she initially believed persons other than Q.L.W. and Eubanks assaulted her and that she did not name Q.L.W. as one of her attackers until she learned that Q.L.W.'s sneakers resembled those M.D. observed on one of her assailants. *See id.* Q.L.W. asserts that a witness identification based solely on a generic article of clothing is insufficient to establish an identity. *Id.* at 20.

We conclude, after evaluating the record in the light most favorable to the Commonwealth as the verdict winner, that the evidence was sufficient to prove Q.L.W.'s identity as one of M.D.'s attackers. The certified record on appeal reflects the following. M.D. testified that after she concluded her second meeting with L.E., she observed Q.L.W. in the alleyway walking towards her. N.T., 8/7/13, at 20. M.D. stated that Q.L.W. started skipping and then began running at her and when Q.L.W. caught up with her, Q.L.W. hit her on the side of the face. *Id.* at 21. M.D. reported that Q.L.W. hit her again, knocking her onto a gate and then the ground. *Id.* M.D. testified that Q.L.W. then pulled her by her hair and started kicking her while she was on the ground. *Id.* M.D. stated that Eubanks then arrived and began hitting and kicking her. *Id.* M.D. reported that before Q.L.W. left the scene, she

grabbed Q.L.W.'s leg and observed that she was wearing white, blue, gray, and pink "Diamond Turf" shoes. *Id.* Humphreys testified that she had previously witnessed Q.L.W. wearing white, gray, pink, and turquoise shoes. *Id.* at 97. Additionally, on January 16, 2013, M.D. identified Q.L.W. as her attacker from a photo array. *See id.* at 106-09. Therefore, based on the foregoing, we agree with the trial court's conclusion that the evidence was sufficient to prove Q.L.W.'s identity as M.D.'s attacker.

Q.L.W. next claims that the evidence was insufficient to prove that she was involved in a conspiracy to assault M.D. Q.L.W.'s Brief at 25-32. Q.L.W. bases this claim on the fact that the conversation Humphreys overheard and testified to showing her involvement in a conspiracy to assault M.D. occurred a week prior to the assault on M.D. *See id.*

The Pennsylvania Crimes Code defines conspiracy as follows:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a). This Court has long held that this requires proof of "(1) an intent to commit or aid in an unlawful act, (2) an agreement with a

co-conspirator and (3) an overt act in furtherance of the conspiracy."

***Commonwealth v. Thoeun Tha***, 64 A.3d 704, 710 (Pa. Super. 2013)

(quoting ***Commonwealth v. Galindes***, 786 A.2d 1004, 1010 (Pa. Super.

2001)). "This overt act need not be committed by the defendant; it need

only be committed by a co-conspirator." ***Commonwealth v. Murphy***, 795

A.2d 1025, 1038 (Pa. Super. 2002) (quotations and citation omitted).

> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators in furtherance of the conspiracy.

***Commonwealth v. McCall***, 911 A.2d 992, 996-97 (Pa. Super. 2006)

(quoting ***Commonwealth v. Johnson***, 719 A.2d 778, 784–85 (Pa. Super.

1998) (en banc)).

We agree with the trial court's conclusion that the evidence was

sufficient, when viewed in the light most favorable to the Commonwealth, to

prove that Q.L.W. was involved in a conspiracy to assault M.D. Humphreys testified that on December 7, 2012, about a week prior to M.D.'s assault, while standing in her bedroom doorway, she overheard a telephone conversation between Q.L.W., L.E., and an unidentified female. N.T., 8/7/13, at 77, 81-85. Humphreys stated that she heard Q.L.W. say that she "tried to hurt [M.D.]" and that Q.L.W.'s "cousin will do it." *Id.* at 83-84. Humphreys reported that the unidentified female asked, "What is it that you want me to do?" *Id.* at 84. Humphreys testified that Q.L.W. answered, "When you see her, don't say anything, hit her till she falls and then start kicking her." *Id.* On December 15, 2012, the attack upon M.D. occurred during which Q.L.W. punched her until she fell and then started kicking her. *Id.* at 10, 21. Therefore, the certified record on appeal supports the trial court's conclusion that there was sufficient evidence proving that Q.L.W. engaged in a conspiracy to assault M.D.

Q.L.W. relies on *Commonwealth v. Holguin*, 385 A.2d 1346 (Pa. Super. 1978) in an attempt to argue that because the conversation that Humphreys overheard occurred roughly a week prior to M.D.'s assault, Q.L.W. could have abandoned the conspiracy in the interim. Q.L.W.'s Brief at 28-32. In *Holguin*, the appellant brought a gun into a bar after his friends, Hughes and Slick, got into a fight. *Holguin*, 385 A.2d at 1348. The appellant and Hughes proceeded to move about the bar pointing the gun at patrons. *Id.* When the appellant, Hughes, and Slick decided to leave, the

appellant and Hughes threatened to come back with more guns.  ***Id.***  About two hours later, Hughes and some other men (but not the appellant) returned to the bar, attempted to kick the bar door open, and fired four gunshots into the bar.  ***Id.*** at 1348-49.  The trial court in that case found the appellant guilty of, *inter alia*, conspiring to commit criminal mischief.[5] ***Id.*** at 1348.  This Court reversed his conviction for conspiring to commit criminal mischief because "[w]e [could not] find beyond a reasonable doubt that [the] appellant did not abandon Hughes during the almost two hour interim between incidents or that [the] appellant agreed to engage in a further escalation of criminal activity."  ***Holguin***, 385 A.2d at 1354.

    We find ***Holguin*** easily distinguishable from the instant matter.  In ***Holguin***, the appellant, although he threatened to come back to the bar with more guns, did not return with Hughes when Hughes attempted to kick the door down and fired four shots into the bar.  ***Id.*** at 1348-49.  Thus, our Court reversed the appellant's conspiring to commit criminal mischief conviction because there was no indication that the appellant did not abandon Hughes after they initially left the bar or that the appellant agreed to engage in an escalation of criminal activity.  ***See id.*** at 1354.  Conversely, here, there was sufficient evidence proving that Q.L.W. not only planned M.D.'s assault, but that she also took part in M.D.'s attack.  Q.L.W.'s participation in M.D.'s assault demonstrates that she did not abandon the

_____

[5]  Criminal mischief occurs where a person damages the tangible property of another.  ***See*** 18 Pa.C.S.A. § 3304(a).

conspiracy in the time between the conversation Humphreys overheard and the attack. Therefore, **Holguin** is not applicable to this case.

For her final issue on appeal, Q.L.W. argues that the verdict was against the weight of the evidence because M.D.'s identification of Q.L.W. and account of the assault were untrustworthy. Q.L.W.'s Brief at 33-36. Q.L.W. believes the evidence of M.D.'s identification was untrustworthy because M.D. initially reported to police that two other people besides Q.L.W. and Eubanks assaulted her and because M.D. did not identify Q.L.W. as one of her attackers until she learned that Q.L.W.'s sneakers resembled those M.D. observed on one of her assailants. **Id.** Q.L.W. also believes M.D.'s testimony was unreliable because despite her claims that her attackers punched and kicked her, neither M.D. nor her unborn baby suffered any injuries other than a broken nail. **Id.** at 35.

Our standard of review when presented with a weight of the evidence claim is different from that applied by the trial court:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim. … Since the trial judge is in the

- 12 -

> best position to view the evidence presented, an appellate court gives the trial judge the utmost consideration when reviewing the court's determination that the verdict is against the weight of the evidence.

***Commonwealth v. Morgan***, 913 A.2d 906, 909 (Pa. Super. 2006) (citation omitted).

Here, the trial court found M.D.'s testimony identifying Q.L.W. as one of her attackers and Humphreys' testimony revealing Q.L.W.'s involvement in a plot to assault M.D. to be credible, and we cannot substitute our judgment for that of the finder of fact. Trial Court Opinion, 3/28/14, at 10-11; ***see also Morgan***, 913 A.2d at 909. Additionally, the record reflects that Q.L.W. conspired to assault M.D. and that Q.L.W. participated in the actual attack. ***See supra***, pp. 7-11. After reviewing the evidence, we conclude that the record supports the trial court's conclusion and that its decision was not an abuse of discretion. Accordingly, Q.L.W.'s weight of the evidence claim also fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/17/2014

- 13 -